UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                Plaintiff,<br><br>v.<br><br>STATE STREET BANK AND TRUST COMPANY,<br><br>                Defendant. | **JURY TRIAL DEMANDED**<br><br>Civil Action No. _____ |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission" or "SEC"), for its Complaint against Defendant State Street Bank and Trust Company ("State Street" or "the Defendant"), alleges the following and, pursuant to Federal Rule of Civil Procedure 38(b), hereby demands a trial by jury of any issue triable of right by a jury:

### PRELIMINARY STATEMENT

1. During the subprime mortgage crisis in 2007, State Street engaged in a course of business that misled investors about the extent of subprime mortgage-backed securities held in certain unregistered funds under its management. As a result of State Street's conduct, investors in State Street's funds lost hundreds of millions of dollars during the subprime market meltdown in mid-2007.

2. State Street offered investments in certain collective trust funds to institutional investors, including pension funds, employee retirement plans, and charities. These funds included two substantially identical funds – referred to together as the Limited Duration Bond

Fund (the "Fund") – made available to different categories of investors. Other actively-managed bond funds and a commodity futures index fund managed by State Street ("the related funds") also invested in the Fund. State Street established the Fund in 2002 and marketed the Fund by saying it utilized an "enhanced cash" investment strategy that was an alternative to a money market fund for certain types of investors. By 2007, however, the Fund was almost entirely invested in or exposed to subprime residential mortgage-backed securities ("subprime investments"). Nonetheless, State Street continued to describe the Fund to prospective and current investors as having better sector diversification than a typical money market fund, while failing to disclose the extent of its exposure to subprime investments.

3. When the subprime market collapsed in mid-2007, many investors in the Fund and the related funds were unaware that the Fund had such significant exposure to subprime investments. In fact, the Fund's offering materials, such as quarterly fact sheets, presentations to current and prospective investors, and responses to investors' requests for proposal, contained misleading statements and/or omitted material information about the Fund's exposure to subprime investments and use of leverage. As a result, many investors either had no idea that the Fund held subprime investments and used leverage, or believed that the Fund had very modest exposure to subprime investments and used little or no leverage.

4. Beginning on July 26, State Street sent a series of shareholder communications concerning the effect of the turmoil in the subprime market on the Fund and the related funds that misled investors and continued State Street's failure to disclose the Fund's concentration in subprime investments. At the same time, State Street provided certain investors with accurate and more complete information about the Fund's subprime concentration. These other investors included clients of State Street's internal advisory groups, which provided advisory services to

some of the investors in the Fund and the related funds. During 2007, State Street's advisory groups became aware, based on internal discussions and internally available information, that the Fund was concentrated in subprime investments. Prior to July 26, 2007, at least one internal advisory group also learned that State Street was going to sell a significant amount of the Fund's distressed assets to meet significant anticipated redemptions. State Street's internal advisory groups subsequently decided to redeem or recommend redemption from the Fund and the related funds for their clients. State Street Corporation's pension plan was one of those clients. State Street sold the Fund's most liquid holdings and used the cash it received from these sales to meet the redemption demands of these better informed investors, leaving the Fund with largely illiquid holdings.

5. By engaging in the conduct described in this Complaint, the Defendant violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77(q)(a)].

6. The Commission seeks the disgorgement of State Street's ill-gotten gains plus prejudgment interest. Pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)], the Commission also seeks the imposition of civil monetary penalties against the Defendants. The Commission also seeks the entry of a Judgment requiring State Street to make a payment to redress shareholder harm. Finally, the Commission seeks the entry of a Judgment requiring State Street to comply with an undertaking concerning, among other things, the retention of an independent consultant to conduct a comprehensive review of its disclosure, compliance and other policies and procedures designed to prevent and detect federal securities violations.

## JURISDICTION AND VENUE

7. The Commission is an agency of the United States of America established by Section 4(a) of the Exchange Act [15 U.S.C. §78d(a)].

8.      This Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§77t(d) and 77v(a)].

9.      State Street, a subsidiary of publicly-traded State Street Corporation, is a Massachusetts trust company and a bank that is a member of the Federal Reserve System. The principal place of business of State Street and State Street Corporation is Boston, Massachusetts.

10.     Certain of the Defendant's acts, practices and courses of business constituting the violations alleged herein occurred within the District of Massachusetts.

11.     In connection with the conduct described in this Complaint, the Defendant directly or indirectly made use of the mails and the means or instruments of transportation and communication in interstate commerce.

## DEFENDANT

12.     State Street is a Massachusetts trust company and a bank based in Boston, Massachusetts. Because State Street is a bank, it relies on the exclusion from the definition of investment adviser contained in Section 202(a)(11) of the Investment Advisers Act of 1940. The unregistered collective trust funds State Street advises, such as the Fund and the related funds, similarly rely on the exclusion from the definition of investment company under Section 3(c)(11) of the Investment Company Act of 1940.

## FACTS

**Background – The Limited Duration Bond Fund ("the Fund")**

13.     State Street established the Fund in February 2002 as an actively-managed fund targeting a return of one-half to three-quarters of one percent per year over the London Inter-Bank Offer Rate (LIBOR), the interest rate that banks charge each other for short-term loans. Like a mutual fund, the Fund offered daily redemptions, and investors purchased or sold units of

the Fund based on the Fund's daily net asset value. As a bank-managed collective trust fund, State Street only offered the Fund and the related funds to certain investors. According to the Fund's offering materials, the Fund's minimum credit quality was BBB, but its average credit quality was always AA or AA+. In mid-June 2007, the Fund had assets of approximately $3 billion.

14. Over the years, the Fund consistently achieved its target performance by heavily concentrating in bonds backed by first lien mortgages to subprime borrowers. The Fund's consistent outperformance of its benchmark and low volatility resulted in State Street's decision to permit its portfolio managers of the related funds to invest up to 25% of those funds' assets in the Fund so those funds could beat their benchmarks. As it became harder to achieve benchmark performance by investing in other segments of the bond market, State Street decided to concentrate an even greater percentage of the Fund in subprime investments.

15. In 2006 and early 2007, State Street magnified the Fund's exposure to subprime investments by increasing the Fund's use of reverse repurchase agreements, credit default swaps, and total return swaps tied to the outperformance of subprime investments. All of these investments had the effect of leveraging the Fund, and, ultimately, exposed the Fund to more risk and volatility.

**Misrepresentations Regarding Subprime Investments, Use of Derivatives, and Leverage**

16. In its offering documents and other communications with investors and prospective investors, State Street stated that the Fund was sector-diversified and was an enhanced cash portfolio (or slightly more aggressive than a money market fund). In fact, the Fund was concentrated in subprime bond investments and derivatives tied to subprime

investments. From inception to June 30, 2007, the Fund's quarterly fact sheet for prospective and current investors stated:

> The Limited Duration Bond Strategy utilizes an expanded universe of securities that goes beyond typical money markets including: Treasuries, agencies, collateralized mortgage obligations, adjustable rate mortgages, fixed rate mortgages, corporate bonds, asset backed securities, futures, options, and swaps. . . When compared to a typical 2 A-7 regulated money market portfolio, the Strategy has better sector diversification, higher average credit quality, and higher expected returns. The tradeoff is this fund purchases issues that are less liquid than money market instruments and these instruments will have more price volatility. This Strategy should not be used for daily liquidity. Returns to the Strategy are more volatile over short horizons than traditional cash alternatives and may not benefit the short-term investor.

In 2006 and 2007, this language misled investors into believing that the Fund had better sector diversification and higher average credit quality than a typical money market portfolio, when in reality by that time the Fund held primarily subprime investments and had a lower average credit quality.

17.     In its offering materials, State Street also misrepresented the Fund's exposure to subprime investments. Through July 2007, the fact sheets, investor presentations, and account statements for the Fund and the related funds presented market value sector exposures for "ABS" (asset backed securities), "MBS" (mortgage-backed securities), etc. For example, the standard Fund presentation and Fund fact sheet that State Street used during the second quarter of 2007 reflected the following exposures in the Fund:



Although some other industry participants also included subprime investments within the "ABS" category, State Street did not define these sector categories in its investor materials. As a result, many investors and State Street client service personnel believed that the Fund and the related funds had very little or no exposure to subprime investments when the subprime turmoil commenced in 2007 because State Street's materials showed little or no "MBS" in the funds. Moreover, State Street also failed to explain that virtually all the Fund's ABS exposure was subprime investments.

18.     Investors' misunderstanding concerning the extent of the Fund's subprime investments was further exacerbated by the fact that many of State Street's client service personnel who answered client questions during the period of market turmoil related to subprime investments, like State Street's clients, did not understand that State Street's undisclosed definition of "ABS" included subprime securities and its definition of "MBS" did not. In fact, the Fund's investors and State Street's own client service personnel were unaware that the Fund's ABS investments were almost wholly comprised of subprime MBS.

19.     State Street's investor marketing materials and presentations in 2006 and 2007 also misrepresented the extent of the Fund's exposure to subprime investment risk, including the Fund's exposure to leveraged subprime investments. During this period, the Fund was leveraged through reverse repurchase agreements on its subprime bonds and through derivative contracts whose value rose and fell based on changes in the value of other subprime investments. The notional value of a derivative contract is the total value of the derivative contract's assets, and a small amount invested in a derivative contract often controls a much larger notional value. Therefore, where a portfolio of assets includes derivative investments, information about a

portfolio's notional value relative to its market value may be necessary to determine a portfolio's exposure to leverage.

20.     Up until 2005, State Street's investor marketing materials and presentations reflected the impact of derivative positions on the Fund's sector exposures by reporting total exposure to various asset sectors in excess of 100% of the net assets of the Fund. In 2005, however, State Street changed these materials to describe the Fund's sector exposures by using a presentation based on only the market value of exposures. This form of reporting displayed exposures totaling 100% (see chart in paragraph 17) without also disclosing that, on a notional basis, the Fund's exposure to subprime investments often exceeded 100% because of the Fund's investment in various subprime derivatives. As a result of State Street's change in disclosure, State Street failed to inform investors in many of its descriptions of the Fund's sector exposures that the Fund's investment performance was tied to subprime and that its use of leverage magnified its exposure to subprime.

21.     In addition to representations of sector diversification in fact sheets, investor presentations, and other State Street offering documents, the investors in the Fund and the related funds had investment management agreements with State Street concerning the investment of their assets in State Street's funds. Some of those agreements included guidelines limiting the use of leverage and requiring diversification. State Street's agreement to comply with those guidelines misled investors concerning the diversification of the Fund and its use of leverage.

22.     State Street's template response to investors' requests for proposal ("RFP") for the Fund to the question "Describe your use of derivatives," stated:

> Approximately 20-30% of the portfolio is comprised of derivative securities. These securities are used because they provide the portfolio with low risk and excellent yields. These securities also dampen the price volatility of the fund. These issues are structurally transparent. We do not maintain a leveraged

exposure. Our competitive advantage at State Street is the use of our large passive funds and the returns they generate to enter into total return swaps, which provide a nice yield to our Limited Duration Bond Strategy with minimal risks. Derivative securities used include financial futures contracts, options and swaps.

23. This statement misled purchasers of the Fund because: 1) the Fund's derivatives typically exceeded 20-30% of the Fund's portfolio; 2) the Fund maintained a leveraged exposure; and 3) the Fund's derivative investments exposed the Fund to greater risk and increased its price volatility. Nonetheless, State Street utilized this answer in a communication with at least two prospective investors of the Fund, one of whom invested in the Fund, representing that the Fund does "not maintain a leveraged exposure," and that there was "no leverage at the product level."

24. In a standard investor presentation concerning the Fund, State Street represented that one of the Fund's objectives was "[m]odest use of leverage to manage risk and enhance returns." However, in 2007, the Fund's use of leverage often resulted in exposure to the subprime market in excess of 150% of the Fund's market value. This leverage exposed the Fund to significant risks and, by July 2007, the Fund's leveraged investments far exceeded the Fund's risk budget based on the expected volatility of the Fund and its benchmark. As a result of State Street's representations regarding leverage, many of the Fund's investors and State Street's client service personnel did not know the Fund had leveraged positions that magnified the Fund's exposure to subprime investments until long after the Fund began a precipitous decline in mid-2007.

25. After a brief period of subprime market turmoil in February 2007, State Street circulated an internal alert to its client service personnel. State Street adapted the internal alert into a nearly identical letter it sent to some investors in the Fund and the related funds in early March 2007. The internal alert and letter stated that the Fund's recent underperformance was

caused by the Fund's small position in a certain subprime derivative investment. The February internal alert and investor letter focused on the Fund's "modest" exposure to a small position in this BBB rated subprime derivative investment: "One of the alpha drivers in State Street's active strategies has been taking modest exposure in the investment grade triple B asset-backed securities market, specifically the sub-prime home equity market." State Street reiterated this statement in an update sent to certain investors in April. As a result of State Street's internal and external communications in the February to April 2007 timeframe, many of State Street's client service personnel and investors in the funds believed that the Fund had a very small exposure to subprime investments.

**State Street's Internal Advisory Groups Caused Their Investors to Redeem the Fund**

26.     Beginning in mid-June 2007, as the market for the Fund's subprime investments was in crisis, the Fund began a precipitous decline in value. In late July 2007, State Street's internal advisory groups recommended to their clients that they withdraw from those funds while State Street continued encouraging others to stay invested and to continue to invest.

27.     In late July 2007, three of State Street's internal advisory groups that oversaw client investments in actively-managed bond funds decided that their clients should redeem their investments in the Fund and the related funds. Those groups were aware of the Fund's exposure to subprime investments and other problems with the Fund that had not been disclosed to other investors because: 1) employees of two of the advisory groups were voting members on State Street's confidential Investment Committee that discussed at length actions to be taken in the Fund in response to the market crisis and anticipated redemptions; 2) the advisory groups had regular access to the Fixed Income trading desk and portfolio managers; and 3) the advisory groups received versions of the internal use only subprime alerts, including State Street's early

July 2007 internal subprime alert described in paragraph 35 below, which caused these groups to seek out and receive more information about the Fund's subprime holdings. The clients in these groups were invested in the Fund and 14 of the related funds. As of July 25, 2007, the clients of these internal advisory groups held approximately 20 percent of the shares in these funds. By early August 2007, because of State Street's actions, virtually all of the advisory groups' clients had redeemed out of the Fund and the related funds.

28.     On the morning of July 25, 2007, an advisory group manager attended State Street's Investment Committee meeting where the main topic was a "strictly confidential" discussion about subprime problems in the actively-managed bond funds. The Investment Committee, which had fiduciary oversight responsibility for all of State Street's funds, discussed major liquidity concerns with the Fund and the need to meet anticipated investor redemptions by selling a significant percentage of the Fund's subprime investments. At the conclusion of the discussion, the Investment Committee voted unanimously to direct the Fund's portfolio managers to sell assets to increase liquidity in the Fund in anticipation of investor redemptions of 25-50% at month end.

29.     Between July 26 and August 1, as a result of the directions from the July 25 Investment Committee meeting, State Street raised almost $700 million in cash to meet anticipated investor redemption demands. Approximately 75 percent of this cash came from the sale of almost all of the Fund's highest rated AAA bonds, even though the Fund's AAA bonds were only 20 percent of the Fund's net asset value at the time of the July 25 Investment Committee meeting. During this same period, the Fund experienced significant redemptions, including redemptions from clients of State Street's internal advisory groups. Therefore, after

11

State Street met the redemption demands of the Fund's more informed clients, average credit quality of the Fund's bonds decreased.

30. State Street imposed no information barriers on the internal advisory groups and had no policies prohibiting their attendance at the Investment Committee meeting. State Street also had no policies prohibiting the internal advisory groups from making investment decisions about the Fund and the related funds after learning material information about the Fund and the related funds at an Investment Committee meeting.

31. Certain employees of one advisory group also learned through internal State Street meetings that: 1) Fixed Income managers believed the primary cause of the Fund's July underperformance was Lehman Brothers' repricing of its subprime indices, and that further declines in these indices were likely (which would exacerbate the Fund's underperformance issues); 2) the Fund was selling assets to raise cash in anticipation of investor redemptions; and 3) the Fixed Income managers expected a potential maximum loss in the Fund of another 3% or 4% of the Fund's value. With that knowledge, the advisory group decided to recommend redemption from the Fund and shortly thereafter recommended redemption from the related funds.

32. On July 25, 2007, a second advisory group decided to redeem or recommend to its clients that they redeem all of their holdings in the Fund and the related funds. In March 2007, those managers had learned that subprime investments were a core part of the Fund strategy, the Fund held at least 75% of its assets in subprime investments, and the Fund had exposure to subprime investments besides the small subprime derivative position described in State Street's internal February alert. A manager of that advisory group also attended State Street's Investment

Committee meetings throughout 2007 and learned that the Fund and the related funds were investing more in higher rated subprime tranches.

33. After that group's decision on July 25, a group member drafted a summary that attributed its decision to recommend redemption to the recent stress on the subprime market and the potential for continued stress on that market. All of the clients who received the recommendation followed it.

34. On July 27, a third State Street advisory group decided to redeem or recommend to its clients that they redeem all of their holdings in State Street's actively-managed bond funds. That group's decision was prompted by hearing that State Street's largest advisory group had decided to get clients out of the Fund.

**Mid-2007 Communications About The Fund**

35. In early July 2007, State Street circulated an internal "client at risk" alert to its internal advisory groups and its other client service personnel that stated that the "the cause" of "substantial underperformance in the month of June… was our exposure to the subprime mortgage market, specifically our exposure to the triple B ABX and, in certain funds such as the Limited Duration [ERISA] Fund, exposure to the high quality CDO market."

36. In mid-July 2007, as the subprime market situation continued to worsen, State Street's Fixed Income group developed answers to Frequently Asked Questions (FAQs) concerning the subprime situation. On July 26, State Street distributed the first set of FAQs to State Street's client service personnel and its internal advisory groups. Senior managers instructed that the FAQs were "to assist you with client/consultant questions" but were "for internal use only" and should only be used for oral discussions with investors. The FAQs enabled State Street's client service personnel to disclose information to certain investors who

13

requested it, including that the Fund was concentrated in subprime investments and that State Street's largest internal advisory group had decided to redeem its clients out of the Fund and the related funds. Many investors who received information from the FAQs redeemed their investments shortly after receiving the information. In late July and early August, in response to requests from certain investors or their outside consultants, State Street also provided the Fund's holdings and disclosed the fact that State Street had decided to reprice some of the Fund's securities to reflect market prices that were lower than the vendor prices State Street had been using to arrive at the Fund's net asset value. All but one of these investors immediately sold their investments before the Fund experienced its most significant losses in August.

37.     In late July and early August 2007, as State Street was preparing to redeem investments by investors in the Fund and the related funds(including the clients of State Street's internal advisory groups) to whom State Street had provided information about the Fund's subprime concentration and other risks, State Street also was sending letters to all investors in the Fund and the related funds that continued to keep many investors in the dark. Investors who only received State Street's offering materials plus its late July and early August letters continued to be misinformed about the risks of the Fund and the related funds and the actions State Street was taking in response to the market crisis. As a result, most of these investors experienced significant investment losses as they continued to hold or purchase shares of the Fund and the related funds after State Street had made disclosures to other investors that caused these more informed investors in the Fund and the related funds to redeem their investments.

A.      On July 26, 2007, State Street sent a letter to all investors in the Fund and related funds concerning the impact of turmoil in the subprime market on those funds. The letter was originally based on the internal "client at risk" alert from early July, but

14

the five-paragraph letter that investors finally received did not include any of the information from that alert regarding the extent of exposure to subprime investments in the Fund. Nor did the letter include the information State Street disclosed to its internal advisory groups and certain other investors described above in paragraphs 26 to 36. The letter disclosed little more than the fact that recent events in the subprime market "are impacting performance in some of our active fixed income portfolios in which you are invested directly or indirectly."

    B.    As for State Street's view of the subprime situation and what it would do in response to the situation, the July 26 letter stated:

> We believe that what has occurred in June, and thus far in July, has been more driven by liquidity and leverage issues than long term fundamentals… We have been seeking to reduce risk in those portfolios where we believe it is appropriate by taking advantage of liquidity in the market when it exists, and will continue to do so, while seeking to avoid putting undue pressure on asset valuations.

However, in conveying that it was seeking to reduce risk, State Street omitted that the steps it was taking to take advantage of liquidity would result in the Fund holding bonds of lower average credit quality and greater illiquidity. As described above, after the July 25 Investment Committee meeting, State Street sold almost all of the Fund's highest rated bonds to meet investor redemptions. To meet the early redemption demands of the more informed investors, including State Street's internal advisory group clients, State Street depleted the cash it raised from the sale of the Fund's highest rated assets at a much faster rate than it sold the Fund's lower rated bonds, resulting in a Fund that held bonds of lower average credit quality and greater illiquidity for investors who remained in the Fund after the anticipated redemptions. Therefore, after receiving State Street's subprime update on July 26, investors relying on State Street's written materials still had no idea

15

they were in a subprime concentrated fund, or that the Fund would soon be concentrated in lower-rated subprime bonds.

   C.   On August 2, 2007, State Street asked its client service personnel to send another letter to all affected investors concerning the subprime situation and preliminary July performance returns. The letter did not disclose the information described in paragraphs 26 to 36 above that State Street had provided to its internal advisory groups and certain other investors who requested the information. In the August 2 letter, State Street again stated it had taken actions to reduce risk, including the sale of certain subprime bonds, while maintaining the Fund's average credit quality. However, State Street had sold almost all of the Fund's highest rated subprime bonds, and, upon meeting anticipated investor redemptions in late July and early August, the Fund's bonds were increasingly lower credit quality. Those investors who remained in the dark concerning the Fund's risks invested in or continued to hold their investment as the Fund became concentrated in lower-rated subprime bonds.

38.   On August 14, 2007, State Street sent a third letter concerning the subprime situation to all affected investors except the clients of State Street's advisory groups. However, once again, the letter did not include the information State Street disclosed to its internal advisory groups and certain other investors described in paragraphs 26 to 36 above. The August 14 letter stated: "While we will continue to liquidate assets for our clients when they demand it, we believe that many judicious investors will hold the positions in anticipation of greater liquidity in the months to come," despite the fact that State Street knew that many of the Fund's investors, including its internal advisory groups and State Street Corporation's pension plan, had redeemed their entire investment in the Fund. In addition, the letter failed to disclose that State

Street had already sold the Fund's most liquid investments and used the cash from those sales to meet investor redemptions.

39. On October 5, 2007, State Street sent another letter to all affected investors concerning a recent lawsuit filed by an investor for losses in funds invested in the Fund. This letter represented:

> Unfortunately, due to certain client redemptions, we were obligated to sell otherwise unimpaired assets into a market which was largely illiquid creating realized losses. These redemptions were a contributing factor in the negative returns. They were not the result of any failure on the part of SSgA's investment management...

However, these redemptions, which included State Street Corporation's pension plan's redemption, in part resulted from State Street's own actions that led to decisions by State Street's internal advisory groups to redeem or recommend redemption of the Fund and the related funds.

## COUNT I

### Violation of Sections 17(a)(2) of the Securities Act

40. Paragraphs 1 through 39 are realleged and incorporated by reference as though fully set forth herein.

41. By engaging in the conduct described above, the Defendant, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, has obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

42. The Defendant made the untrue statements and omissions of material fact described above.

17

43. By reason of the foregoing, the Defendant violated Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## COUNT II

### Violation of Section 17(a)(3) of the Securities Act

44. Paragraphs 1 through 39 are realleged and incorporated by reference as though fully set forth herein.

45. By engaging in the conduct described above, the Defendant, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, has engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

46. The Defendant engaged in the devices, schemes, artifices, transactions, acts, practices and courses of business described above.

47. By reason of the foregoing, the Defendant violated Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

**I.**

Find that the Defendant committed the violations charged and alleged herein.

**II.**

Issue a Judgment requiring State Street to disgorge the ill-gotten gains that it received as a result of its wrongful conduct, including prejudgment interest.

### III.

Issue a Judgment imposing upon State Street appropriate civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)].

### IV.

Issue a Judgment requiring State Street to make a payment to redress shareholder harm.

### V.

Issue a Judgment requiring State Street to comply with an undertaking concerning, among other things, the retention of an independent consultant to conduct a comprehensive review of its disclosure, compliance and other policies and procedures designed to prevent and detect federal securities violations.

Respectfully submitted,

**SECURITIES AND EXCHANGE COMMISSION,**

By its attorneys,

_____
Deena R. Bernstein (Mass Bar No. 558721)
 Senior Trial Counsel
 BernsteinD@sec.gov
Robert B. Baker (Mass Bar No. 654023)
 Senior Enforcement Counsel
 BakerR@sec.gov
33 Arch Street, 23rd Floor
Boston, MA 02110
(617) 573-8900
(617) 573-4590 (facsimile)

Dated: February 4, 2010